IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| FREEDOM MEDICAL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 5:09cv152 |
| v. | § | |
| | § | |
| PREMIER PURCHASING PARTNERS, L.P.; | § | |
| PREMIER, INC.; NOVATION, L.L.C; | § | JURY |
| UNIVERSAL HOSPITAL SERVICES, INC.; | § | |
| and HILL-ROM COMPANY, INC., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Freedom Medical, Inc. (hereinafter "plaintiff" and/or "Freedom") and files this Complaint against Premier Purchasing Partners, L.P. and Premier, Inc.; (hereinafter collectively "Premier"); Novation, L.L.C. ("Novation"); Universal Hospital Services, Inc. (hereinafter "UHS"); and Hill-Rom Company, Inc. (hereinafter "Hill-Rom"), hereinafter collectively "defendants".

Freedom asserts that defendants combined and/or conspired to eliminate or lessen competition and to acquire and maintain monopoly power in the relevant markets described below. The conspiracy was intended to, and did, have a foreseeable and substantial effect on United States commerce as well as plaintiff, who has suffered cognizable injuries as a result of defendants' wrongful conduct. As a result of these activities, plaintiff alleges causes of action against defendants arising under the antitrust laws of the United States, as well as the common law and antitrust law of Texas, and demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Freedom further asserts that defendants have tortuously interfered with plaintiff's existing and prospective business relationships and contracts.  Freedom also asserts that defendants have used disparaging words against plaintiff and its products, and that such words are grounded in falsity and made with malice.

Freedom, having suffered cognizable injuries as a result of defendants' wrongful conduct, now brings this civil action against defendants to recover injunctive relief and damages.

In support of these claims, Freedom respectfully alleges the following:

## I.        PARTIES

1.        Freedom is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business being located in Exton, Pennsylvania 19341.

2.        Hill-Rom is a foreign corporation that does business in Texas. Hill-Rom is duly authorized to transact business in the State of Texas and may be served with process by serving its registered agent for service, CT Corp System, 350 N. St. Paul Street, Dallas, Texas 75201.

3.        UHS is a foreign corporation that does business in Texas. UHS is duly authorized to transact business in the State of Texas, and may be served with process by serving its registered agent for service, National Registered Agents, Inc., 16055 Space Center, Suite 235, Houston, TX 77062.

4.        Premier, Inc. is a foreign corporation that does business in Texas.  Premier, Inc. authorized to transact business in the State of Texas. On information and belief, Premier, Inc. is being sued not only as an independent entity, but also as an agent for its member facilities. Premier, Inc. has obtained a certificate of authority, is duly authorized to transact business in the State of Texas, and may be served with process by serving its registered agent for service, Esperanza Tamez, at 801 Lincoln Street, Laredo, Texas 78040.

5.        Premier Purchasing Partners, L.P. is a limited partnership doing business in Texas.   On information and belief, Premier Purchasing Partners, L.P. is being sued not only as

an independent entity, but also as an agent for its member facilities. Premier Purchasing Partners, L.P. has sufficient contacts with Texas that, under the Texas Long-Arm Statute, Section 17.044 *et seq.* of the Texas Civil Practice and Remedies Code, it may be served with process by serving the Texas Secretary of State, with process to be forwarded to Defendant's registered agent in California, Anthony E. Moreno, 12760 High Bluff Drive, Suite 250, San Diego, California 92130.

6.          Novation is a foreign corporation that does business in Texas. Novation is duly authorized to transact business in the State of Texas and may be served with process by serving its registered agent for service, CT Corporation System, 350 N. St. Paul Street, Dallas, TX 75201.

## II.          JURISDICTION AND VENUE

### A.          SUBJECT MATTER JURISDICTION

7.          This action arises under the state and federal antitrust acts and the statutory and common law of Texas.   The alleged agreements affect interstate commerce and the defendants all operate in interstate commerce, selling products across state lines and contracting for sales across state lines.   This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 15(a), 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1367(a).

### B.          PERSONAL JURISDICTION

8.          This Court possesses personal jurisdiction over Hill-Rom because it regularly does business in the State of Texas, because it maintains an office, place of business and/or agency for transacting business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

9.          This Court possesses personal jurisdiction over UHS because it regularly does business in the State of Texas, because it maintains an office, place of business and/or agency for transacting business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

10.       This Court possesses personal jurisdiction over Premier Purchasing Partnership and Premier, Inc. because they regularly do business in the State of Texas, because they maintain an office, place of business and/or agency for transacting business in the State of Texas, and because of their commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

11.       This Court possesses personal jurisdiction over Novation, L.L.C. because it regularly does business in the State of Texas, because it maintains an office, place of business and/or agency for transacting business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

**C.    VENUE**

12.       Venue for this case is proper in the United States District Court for the Eastern District of Texas, Texarkana Division, pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. §391(b), (c), and (d) because defendants reside (as defined by 28 U.S.C. § 1391(c)) in the Eastern District of Texas; maintain principal offices and an agent in the Eastern District of Texas; are aliens; or a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

### III.    FACTS & ALLEGATIONS

13.       The following statements are made upon information and belief.

**A.    RELEVANT MARKETS**

14.       Freedom is an emerging provider of life-saving biomedical equipment and related services to healthcare providers throughout the United States and other countries.  The equipment Freedom offers includes a wide range of quality products such as ventilators, defibrillators, intravenous pumps, patient monitors and other lifesaving biomedical equipment.

15.       Since its formation in 1996, Freedom has worked to fulfill its mission to become healthcare providers' outsourcing resource for their biomedical equipment needs.  To

meet these needs, Freedom maintains biomedical equipment keeping such equipment on-hand in its warehouses nationwide.  Its local branches are located on both coasts and in between. Freedom also maintains a transportation network to deliver its equipment to healthcare providers within hours of a request.  Freedom is always open and ready to meet a healthcare provider's biomedical equipment needs.  Freedom consistently offers the same biomedical equipment for rent as competitors, but for a lower price.

16.    Freedom rents biomedical equipment to healthcare providers to meet either temporary or long-term needs.

17.    Healthcare providers may turn to a biomedical equipment rental supplier in the face of an unanticipated equipment shortage, when there is a sudden surge of patients in need of care and insufficient biomedical equipment on-hand to meet the need.  For example, in the wake of the September 11, 2001 terrorist attacks, the number of patients surged in New York City and Washington, D.C. area hospitals.  Within hours after the day's events began to unfold, Freedom mobilized its transportation network and delivered its warehoused biomedical equipment products — defibrillators, ventilators, breathing pumps and cardiac monitors — to effected hospitals the same day.   Similarly, in August 2005, Freedom mobilized its equipment to assist in areas affected by Hurricane Katrina.  Again, in September 2008, Freedom joined other first responders after Hurricane Ike devastated Galveston Island.

18.    Biomedical equipment rentals will likely be used to meet patient needs in the event of future possible disasters, be they natural, such as a severe earthquake or devastating hurricane, or man-made such as a terrorist attack.  During such times, faced with a sudden shortage of biomedical equipment, healthcare providers cannot reasonably turn instead to equipment purchase because their equipment needs are immediate, temporary and/or unanticipated.

19.    Healthcare providers also turn to biomedical equipment rental suppliers when, for instance, there is insufficient capital to purchase biomedical equipment needed for anticipated

patient care.  To have sufficient biomedical equipment on premises, a healthcare provider may instead turn to a rental supplier.  In recent years, healthcare providers have increasingly turned to biomedical equipment rentals to meet their regular needs.

20.     Whether healthcare suppliers turn to biomedical equipment rental suppliers to meet an unanticipated or an anticipated need, the biomedical equipment rental market is not reasonably interchangeable with biomedical equipment purchases.

21.     A relevant market in this case is the biomedical equipment rental market. The total market dollars for this market has been estimated at over $450 million annually.  Freedom operates as a supplier in the biomedical equipment rental market.

22.     Hill-Rom operates in the biomedical equipment rental market.

23.     Hill-Rom is a large corporation that competes in the biomedical equipment rental market and in other healthcare supply markets.  For example, Hill-Rom also supplies capital equipment for healthcare providers including beds and furniture and supplies technical and professional services, sometimes referred to as asset management, deploying on-site personnel to healthcare suppliers.

24.     UHS operates in the biomedical equipment rental market.

25.     UHS is a large corporation that competes in the biomedical equipment rental market and other healthcare supply markets.  For example, UHS supplies technical and professional services, sometimes referred to as asset management, deploying on-site personnel to healthcare suppliers, as well as sales and remarketing services.

26.     The relevant geographic market for the biomedical equipment rentals is the United States.

27.     Another relevant market in this case is Group Purchasing Organization ("GPO") brokerage services.

28.     GPOs broker contracts with medical product suppliers covering (1) the terms under which the GPO will provide GPO brokerage services to those suppliers and (2) the terms

of the standard-form contracts those suppliers will offer healthcare providers via the GPO. GPOs do not manufacture, handle, or ship medical devices, with the possible exception of certain private label products.  Instead, GPOs are administrative "middlemen," the conduit between medical equipment suppliers and healthcare providers.  In practice, a GPO's true function is to deliver substantial market share to medical equipment suppliers in exchange for substantial "administrative fees" and other forms of remuneration and benefits.

29.       GPOs were created to drive healthcare costs down, allowing healthcare providers to band together to negotiate the best prices from suppliers.  However, in recent years, it is unclear that they work to meet this goal.  As GPOs collect fees from suppliers, there is an incentive to award contracts to the suppliers that will pay them the largest fees or offer other rewards even if those suppliers do not offer healthcare providers, or ultimately patients, the lowest product prices.

30.       The healthcare providers who are members of GPOs retain their individual capacity to act collectively with other purchaser-members in the GPOs and with the GPO itself. As such, the GPOs are not unitary organizations, but are comprised of autonomous or semi-autonomous members.  The members of each GPO, as autonomous entities, both (i) retain the capacity to act collectively, and (ii) have acted collectively as participants in the GPOs.  The healthcare providers who are members of the GPOs receive rebates and other incentives when they use suppliers under contract with the GPOs.  When they do not use suppliers under contract with the GPO, healthcare providers can be penalized, facing higher product prices or the loss of pay-outs from the suppliers.

31.       GPO brokerage services have no reasonably interchangeable substitutes because the alternatives require incurring higher contracting and marketing costs and cannot offer suppliers the same predictable increase in sales as being selected for a GPO contract.

32.       GPO brokerage services are used by healthcare providers for biomedical equipment rentals.

33.     Biomedical equipment suppliers without access to GPO brokerage services suffer higher contracting and marketing costs than if they had such access.

34.     Biomedical equipment rental suppliers without access to GPO brokerage services suffer lower sales than if they had access.

35.     Premier operates in the GPO brokerage services market. Premier is owned by approximately 200 not-for-profit hospitals and healthcare systems.  Premier negotiates contracts with suppliers to provide services to their member facilities.  It selects suppliers for contract in several markets, including the biomedical equipment rental market.  Suppliers can submit proposals for contracts, submitting bids to be selected for contracts.  Once contracts are awarded, Premier's field force works with hospitals to implement contracts. Premier receives sizable fees from suppliers awarded contracts.

36.     Novation operates in the GPO brokerage services market.

37.     Novation is the industry's leading health care contracting services company. VHA and UHC, two national health care alliances that serve 2,500 health care organizations nationwide, own Novation. Novation manages more than 900 contracts covering hundreds of thousands of products produced by domestic and international manufacturers.  These contracts involve supplying several markets, including the biomedical equipment rental market.

38.     The relevant geographic market for GPO brokerage services is the United States.

**B.     MARKET SHARES AND MARKET POWER**

39.     UHS has at least a market share of 60% in the national biomedical equipment rentals market.

40.     Hill-Rom has at least a market share of 30% in the national biomedical equipment rentals market.

41.     Hill-Rom and UHS together have at least 90% of the national biomedical equipment rentals market.

42.      Entry barriers are substantial in the national biomedical equipment rentals market. Entry barriers include, but are not limited to, high start-up costs comprised in part of buying, maintaining, and storing biomedical equipment, maintaining insurance coverage on the biomedical equipment, retaining expert personnel to service biomedical equipment, purchasing and maintaining a fleet of vehicles for equipment transport and delivery, and maintaining local offices nationwide.

43.      UHS has substantial power to raise prices over competitive levels in the national biomedical equipment rental market.

44.      UHS has exercised substantial power to exclude competitors in the national biomedical equipment rental market, such as via foreclosing agreements.

45.      UHS has market power in the biomedical equipment rental market.

46.      UHS has monopoly power in the biomedical equipment rental market.

47.      Hill-Rom has substantial power to raise prices over competitive levels in the national biomedical equipment rental market.

48.      Hill-Rom has exercised substantial power to exclude competitors in the national biomedical equipment rental market, such as via foreclosing agreements.

49.      Hill-Rom has market power in the biomedical equipment rentals market.

50.      Premier, a GPO, has a market share of over 30% in the GPO brokerage services market.

51.      Novation has a market share of over 30% in the GPO brokerage services market.

52.      After Premier and Novation, the five biggest GPOs are Broadlane, Health Trust Purchasing Group (HPG), MedAssets, Amerinet, and Consorta, each of which has from 5-15% of the GPO brokerage services market.

53.      Together, the seven biggest GPOs have over 95% of the GPO brokerage services market.

54.      Entry barriers are substantial in the GPO brokerage services market.

55.      Premier has market power in the GPO brokerage services market.

56.      Novation has market power in the GPO brokerage services market.

**C.      ANTICOMPETITIVE AGREEMENTS**

57.      UHS has entered into sole-source contracts with GPOs, under which the GPO agrees that during the contract period it will provide GPO brokerage services on biomedical equipment rentals exclusively to UHS.

58.      UHS penalizes GPOs that will not agree to enter into sole-source contracts. The penalties for a GPO that does not agree to a sole-source contract include UHS's practice of paying the GPO less in administrative fees and/or other revenue than it otherwise would.

59.      UHS and Hill-Rom have entered into dual-source contracts with GPOs, under which the GPO agrees that during the contract period it will provide GPO brokerage services on biomedical equipment rentals exclusively to Hill-Rom and UHS.

60.      UHS and Hill-Rom penalize GPOs that will not agree to dual-source contracts.  The penalties for a GPO that does not agree to a dual-source contract include UHS's and Hill-Rom's practice of paying the GPO less in administrative fees and/or other revenue than they otherwise would.

61.      Hill-Rom's and UHS's dual-source contracts with GPOs and UHS's sole-source contracts with GPOs have together foreclosed a substantial share of the GPO brokerage services market.

62.      UHS has entered into sole-source contracts for biomedical equipment rentals with Broadlane.

63.      UHS has entered into sole-source contracts for biomedical equipment rentals with Amerinet.

64.      Hill-Rom and UHS have entered into dual-source contracts for biomedical equipment rentals with HealthTrust Purchasing Group.

65.     Hill-Rom and UHS have entered into dual-source contracts for biomedical equipment rentals with MedAssets.

66.     Hill-Rom and UHS have entered into dual-source contracts for biomedical equipment rentals with Consorta.

67.     Hill-Rom and UHS have entered into multi-source contracts for biomedical equipment rentals with Novation.

68.     Hill-Rom and UHS have entered into dual-source contracts for biomedical equipment rentals with Premier.

69.     The substantial foreclosure of the GPO brokerage services market has foreclosed Freedom from access to GPO brokerage services at many GPOs.

70.     Suppliers also make sizable payments to GPOs in return for so-called "commitment contracts", which obligate member hospitals to rent biomedical equipment exclusively from a single supplier.  Suppliers awarded a GPO contract can take the additional step of entering into a commitment contract with a healthcare provider.

71.     Hill-Rom has entered into commitment contracts with healthcare providers, under which the providers commit to buy all or a high share (over 50%, often 90% or more) of their biomedical equipment rentals from Hill-Rom.

72.     Hill-Rom's commitment contracts with healthcare providers are often brokered by GPOs.

73.     Hill-Rom penalizes healthcare providers that do not enter into commitment contracts, including by the practice of charging them higher prices for biomedical equipment rentals than they would otherwise charge.

74.     Hill-Rom rewards healthcare providers that enter into and/or utilize the commitment contracts brokered by GPOs, offering rebates and/or discounts to the healthcare providers based on the volume of business under the commitment contracts.  Hill-Rom and GPO representatives monitor healthcare provider compliance with the commitment contracts.

11

75.     Premier is one of the GPOs that has brokered Hill-Rom's commitment contracts with healthcare providers.

76.     The purchases committed by Hill-Rom's commitment contracts equal a substantial share of the biomedical equipment rentals market.

77.     UHS has entered into commitment contracts with healthcare providers, under which the providers commit to buy all or a high share (over 50%, often 90% or more) of their biomedical equipment rentals from UHS.

78.     UHS's commitment contracts with healthcare providers are often brokered by GPOs.

79.     UHS penalizes healthcare providers that do not enter into commitment contracts, charging them higher prices for biomedical equipment rentals than they would otherwise charge.

80.     UHS rewards healthcare providers that enter into and/or utilize the commitment contracts brokered by GPOs, offering rebates and/or discounts to the healthcare providers based on the volume of business under the commitment contracts.  UHS and GPO representatives monitor healthcare provider compliance with the commitment contracts.

81.     Premier is one of the GPOs that has brokered UHS's commitment contracts with healthcare providers.

82.     Novation is one of the GPOs that has brokered UHS's commitment contracts with healthcare providers.

83.     The purchases committed by UHS's commitment contracts equal a substantial share of the biomedical equipment rentals market.

84.     The purchases committed by Hill-Rom's and UHS's commitment contracts together equal a substantial share of the biomedical equipment rentals market.

85.     Hill-Rom's and UHS's commitment contracts with healthcare providers has substantially foreclosed Freedom from access to healthcare providers.

12

86.     From December 2004 to November 30, 2007, Freedom successfully provided biomedical equipment rentals under a multi-source contract brokered by Premier.  Hill-Rom and UHS were also under contract with Premier.

87.     In 2007, with the multi-source contract set to expire, Freedom, Hill-Rom, and UHS submitted bids for Premier's next biomedical equipment rental contract.  During the bidding process Freedom offered the lowest prices and the same biomedical equipment for rent as Hill-Rom and UHS.  Despite this, Premier awarded a dual-source contract to Hill-Rom and UHS, and ceased providing GPO brokerage services to Freedom.

88.     Premier has manipulated its bidding, product review, and approval process to reject Freedom despite its offering lower prices and equal quality biomedical equipment.

89.     After Premier rejected its bid, Freedom filed a grievance to determine why it was not awarded the contract.  Premier, responding to the grievance, repeatedly asserted that Freedom's bid was not competitive.  Freedom, however, offered the lowest rental prices among bidders.

90.     On information and belief, Premier rejected Freedom's bid because according to UHS's and/or Hill-Rom's bid proposals, Premier would be paid higher fees under a dual-source contract than under a multi-source contract.  On information and belief, Premier rejected Freedom's bid and awarded a dual-source contract to Hill-Rom and UHS because of the tiered pricing Hill-Rom and UHS submitted.  Hill-Rom and UHS proposed tiered pricing wherein, under a dual-source contract, member hospitals would pay far lower prices for products than they would pay under a multi-source contract.  In other words, had Premier awarded a multi-source contract to Hill-Rom, UHS, and Freedom, Hill-Rom and UHS would charge healthcare providers starkly higher prices than they would charge if Freedom was not on the contract.

91.     After evaluating the bids, Premier awarded Hill-Rom and UHS a dual-sourced contract for biomedical equipment rentals even though this resulted in healthcare providers, and ultimately patients, paying higher prices than those Freedom offered.

92.     Foreclosure from GPO brokerage services at Premier and other GPOs has lowered Freedom's biomedical equipment rentals to GPO members and raised Freedom's contracting and marketing costs per rental.

93.     As a result of the foreclosing contracts, healthcare providers effectively cannot rent biomedical equipment from Freedom, regardless of price, because the healthcare providers' policy is to utilize only GPO contracted provides — requiring rentals through Hill-Rom or UHS through the Premier contracts.

94.     The foreclosure of healthcare provider purchases with commitment contracts has foreclosed Freedom from a substantial share of the biomedical equipment rentals market.

95.     Freedom offers the same equipment as Hill-Rom and UHS at lower prices.

96.     Despite its lower prices and equal quality equipment, Freedom's market share is much lower than Hill-Rom's and UHS's because of the foreclosing agreements with GPOs and healthcare providers.

97.     Because the foreclosing agreements have suppressed Freedom's sales, they have deprived Freedom of the economies of scale it otherwise would have had.

98.     Without the foreclosing agreements, biomedical equipment rental competitors would be able to compete better with Hill-Rom and UHS, lowering prices in the biomedical equipment rental market.

99.     The foreclosing agreements have helped UHS maintain or obtain monopoly power in the biomedical equipment rentals market.

100.    The foreclosing agreements unreasonably restricted consumer and provider choice and access to less expensive quality products.

101.    The foreclosing agreements could jeopardize public health and safety by decreasing the quantity of ventilators, defibrillators, infant care and other lifesaving biomedical equipment available for rental in the event of a natural or man-made disaster.

102.     The foreclosing agreements drive up healthcare costs by effectively prohibiting healthcare providers from using the least expensive supplier to rent biomedical equipment.

103.     The foreclosing agreements have substantially decreased competition in Texas and in interstate commerce.

104.     The foreclosing agreements have no procompetitive justifications.

105.     Freedom was injured and financially damaged as a result of defendants' illegal conduct.

106.     UHS enters into exclusive purchasing contracts with biomedical equipment manufacturers to purchase products for the biomedical equipment rental market.

107.     UHS uses its market power to induce manufacturers to agree to exclusive contracts by threatening to otherwise not purchase from them, thereby excluding them from more than half of the biomedical equipment rental market.

108.     These exclusive purchasing contracts prevent competitors from supplying products for the biomedical equipment rental market from supplying products from certain manufacturers.

109.     UHS's exclusive purchasing contracts include contracts with Stryker, Smith and Nephew, Natus Neo, and Electromed.

110.     UHS's exclusive purchasing contracts have foreclosed Freedom from purchasing certain biomedical equipment to offer healthcare providers.

111.     UHS's exclusive purchasing contracts have inhibited healthcare providers, and ultimately the patients, from renting certain biomedical equipment from any supplier other than UHS.

112.     On October 1, 2009, Novation launched a Bedside Care Standardization Program ("BCSP") aimed at reducing variation for non-clinically preferred products while increasing ordering efficiencies.  The program is scheduled to run until September 30, 2012.

113.     Months prior to the BCSP launch, to select the contracted suppliers for the program, Novation solicited bid proposals.  After submitting their bids, Hill-Rom and Freedom were awarded a dual-source contract for the BCSP category of Equipment Rental.

114.     Freedom and Novation entered into a contract for the BCSP program in April 2009.

115.     On the day the program was launched, Freedom learned from Novation that UHS would be added as a BCSP Equipment Rental supplier.

116.     Prior to the program launch, UHS had not been awarded a BCSP contract. Prior to the program launch, both Novation's and Freedom's marketing teams notified healthcare providers that Freedom would participate in the BCSP and that UHS would not.

117.     Prior to the program launch, Freedom had customers and potential customers lined-up to change suppliers from UHS to Freedom under the program.  Belatedly adding UHS as a BCSP supplier cost Freedom substantial credibility with customers and potential customers.

118.     On information and belief, Novation agreed to belatedly add UHS as a BCSP supplier because, by doing so, Novation would reap additional administration fees paid by UHS for business done under the program contract.  Because of UHS's market power, and its significant volume of business, Novation stands to collect significant administrative fees from adding UHS to the program.  At least in this way, UHS was able to use its leverage to gain late admission to the program.

119.     Upon raising concerns about UHS's late addition as a BCPS supplier, Novation told Freedom that its only recourse was to file a formal grievance.  Freedom filed the grievance and requested that UHS's BCPS participation be delayed until the grievance procedure was completed.  Novation denied the request.

120.     Days after Freedom raised concerns about UHS's belated addition as a BCSP supplier, Novation contacted Freedom regarding certain products Freedom was under contract as a supplier.  Freedom was told that the products — therapeutic support products and Bariatric line

items — were included in a different contract with a different supplier.  Novation notified Freedom that the supplies would be removed from the Freedom agreement.

121.    UHS purposefully exercised monopoly power to induce Novation to avail its GPO brokerage services and belatedly add it as a BCSP supplier.

122.    In the absence of monopoly power, UHS could not have induced Novation to belatedly add them as suppliers.

123.    UHS and Novation conspired to maintain UHS's monopoly power.

124.    UHS's exercise of monopoly power injured Freedom and caused it financial damages.

125.    UHS's exercise of monopoly power has no procompetitive justifications.

126.    Freedom was injured and financially damaged as a result of defendants' illegal conduct.

### D.    THE DEFENDANTS' INTERFERENCE WITH PLAINTIFF'S EXISTING AND PROSPECTIVE CONTRACTS

127.    Prior to the events in controversy, Freedom had entered into contractual relationships with a number of healthcare providers for the rental of Freedom's biomedical equipment.

128.    Further, Freedom was in the process of, and continues to negotiate and discuss contractual relationships with a number of distributors and healthcare providers for the rental of Freedom's biomedical equipment.  Several of such prospective relationships were reasonably certain to have resulted in actual contracts between Freedom and these distributors and healthcare providers, given the prospective customers' pleasure with Freedom's prices.

129.    As a direct result of defendants' anticompetitive agreements, as well as conduct in providing rewards such as rebates and other illegal conduct, healthcare providers that had previously contracted with Freedom terminated their contractual relationships in order to conduct business with Hill-Rom or UHS through Premier.

17

130.    As a direct result of defendants' anticompetitive agreements, as well as conduct in providing rewards such as rebates and other illegal conduct, distributors and healthcare providers who had reasonable probabilities of entering into contractual relationships with plaintiff terminated their contacts and refused to enter into contractual relationships.

131.    The result of such conduct of defendants was foreseeable, and occurred directly as a result of defendants' intentional and malicious actions for the purpose of building and maintaining their anticompetitive practices, as well as for the purpose of harming Freedom and other suppliers of rental equipment.  The evidence will show that under such circumstances, defendants acted illegally and without privilege or justification in taking such coercive action.

132.    And further, as set out in more detail below, UHS and Hill-Rom have misrepresented to the public and to Freedom's customers the characteristics and qualities of Freedom's equipment with the intent and effect of maintaining their market dominance and excluding Freedom's products from the market.

133.    Freedom was injured and financially damaged as a result of such conduct.

### E.    DEFENDANTS' CONDUCT IN DISPARAGING PLAINTIFF AND PLAINTIFF'S PRODUCTS

134.    In the course of building and maintaining its monopolistic practices, defendants Hill-Rom and UHS published to Freedom's customers, prospective customers, other GPOs, and other biomedical equipment renters certain statements about Freedom and the quality of Freedom's products and ability to supply the same.

135.    Hill-Rom employees have stated to customers that Freedom's rental fleet is old and in disrepair and that Freedom is financially unstable and on the verge of going out of business.  Hill-Rom employees have also told healthcare providers that, as Freedom no longer had a contract with Premier, they could not use Freedom as a supplier.

136.    UHS employees have stated to customers that Freedom's rental fleet is old and in disrepair, that Freedom is financially unstable and on the verge of going out of business, that Freedom is no more than a "mom-and-pop shop" or a "three-man operation".

137.     Hill-Rom employees have stated to customers and GPOs that Freedom does not have the financial resources to fund the equipment needed for major contracts or agreements.

138.     UHS employees have stated to customers and GPOs that Freedom does not have the financial resources to fund the equipment needed for major contracts or agreements.

139.     Such statements were, at the time, and continue to be, false statements.

140.     Defendants were aware of the statements' falsity at the time, and they nonetheless elected to make such statements.  In the alternative, defendants entertained serious doubts as to the truthfulness of the statements about Freedom and Freedom's biomedical equipment, and nevertheless elected to make such statements.

141.     The result of such false statements of defendants was foreseeable, and occurred directly as a result of defendants' intentional and malicious actions for the purpose of building and maintaining their monopolistic practices; such statements were made with ill will for the purpose of harming the Freedom in the relevant markets. The evidence will show that under such circumstances, defendants acted with malice and without privilege in making such statements.

142.     Freedom was injured and suffered special damages as a result of such statements and conduct.  Members of Premier as well as other potential customers were induced not to deal with Freedom.  As a result, Freedom suffered (i) a loss of reasonably foreseeable net profits, (ii) lost goodwill from prospective purchasers, and (iii) lost standing among prospective purchasers by being held in disrepute.

143.     Plaintiff was injured and financially damaged as a result of such conduct.

## IV.    CAUSES OF ACTION

### A.    AGREEMENTS IN RESTRAINT OF TRADE

144.     Plaintiff reiterates the factual allegations contained in paragraphs 1-143.

1.  UHS's Sole-Source GPO Contracts Alone

145.     UHS's sole-source contracts with GPOs are agreements in restraint of trade.

146.     UHS's sole-source contracts with GPOs foreclosed a substantial share of the GPO brokerage services market.

147.     UHS's sole-source contracts with GPOs had anticompetitive effects on the ability of rival providers of biomedical equipment rentals to compete, raising rivals' costs and inflating market prices.

148.     UHS's sole-source contracts with GPOs had no offsetting procompetitive justifications that could not have been achieved with less-restrictive alternatives.

### 2. Hill-Rom and UHS's Dual-Source GPO Contracts Together

149.     Hill-Rom and UHSs's dual-source contracts with GPOs are agreements in restraint of trade.

150.     Hill-Rom and UHS's dual-source contracts with GPOs have together foreclosed a substantial share of the GPO brokerage services market.

151.     Hill-Rom and UHS's dual-source contracts with GPOs have together had anticompetitive effects on the ability of rival providers of biomedical equipment rentals to compete, raising rivals' costs and inflating market prices.

152.     Hill-Rom and UHS's dual-source contracts with GPOs had no offsetting procompetitive justifications that could not have been achieved with less-restrictive alternatives.

### 3. Hill-Rom's and UHS's Commitment Contracts

153.     Hill-Rom's and UHS's commitment contracts with healthcare providers are agreements in restraint of trade.

154.     Hill-Rom's and UHS's commitment contracts with healthcare providers foreclosed a substantial share of the biomedical equipment rentals market.

155.     Hill-Rom's and UHS's commitment contracts with healthcare providers had anticompetitive effects on the ability of rival providers of biomedical equipment rentals to compete, raising rivals' costs, inflating market prices, and lowering product quality.

156.     Hill-Rom's and UHS's commitment contracts with healthcare providers had no offsetting procompetitive justifications that could not have been achieved with less-restrictive alternatives.

4. Other Effects of the Above Agreements in Restraint of Trade

157.     The above agreements in restraint of trade, whether viewed together or separately, produced, and continue to produce, adverse, anti-competitive effects on interstate commerce in the United States, including, but not necessarily limited to, commerce in or affecting Texas.

158.     The above agreements in restraint of trade, whether viewed together or separately, resulted in injury to the business or property of Freedom.

**B.     BIOMEDICAL EQUIPMENT RENTAL AGREEMENTS CONDITIONED ON NOT DEALING WITH COMPETITORS**

159.     Plaintiff reiterates the factual allegations contained in paragraphs 1-158.

1. UHS's Commitment Contracts Alone

160.     UHS's commitment contracts with healthcare providers for the rental of biomedical equipment include the condition that healthcare providers not use or deal in the goods offered by rival rental suppliers for all or the lion's share of their purchases.

161.     The practical effect of UHS's commitment contracts with healthcare providers is to prevent those healthcare providers from using or dealing in goods leased by rival rental suppliers.

162.     UHS's commitment contracts with healthcare providers foreclosed a substantial share of the biomedical equipment rentals market.

163.     UHS's commitment contracts with healthcare providers have substantially lessened competition.

164.     UHS's commitment contracts with healthcare providers had no offsetting procompetitive justifications that could not have been achieved with less-restrictive alternatives.

2. Hill-Rom's Commitment Contracts Alone

165.    Hill-Rom's commitment contracts with healthcare providers for the rental of biomedical equipment include the condition that healthcare providers not use or deal in the goods offered by rival rental suppliers for all or the lion's share of their purchases.

166.    The practical effect of Hill-Rom's commitment contracts with healthcare providers is to prevent those healthcare providers from using or dealing in goods leased by rival rental suppliers.

167.    Hill-Rom's commitment contracts with healthcare providers foreclosed a substantial share of the biomedical equipment rentals market.

168.    Hill-Rom's commitment contracts with healthcare providers have substantially lessened competition.

169.    Hill-Rom's commitment contracts with healthcare providers had no offsetting procompetitive justifications that could not have been achieved with less-restrictive alternatives.

3. Hill-Rom and UHS's Commitment Contracts Together

170.    Hill-Rom and UHS's commitment contracts with healthcare providers for the rental of biomedical equipment include the condition that healthcare providers not use or deal in the goods offered by rival rental suppliers for all or the lion's share of their purchases.

171.    The practical effect of Hill-Rom and UHS's commitment contracts with healthcare providers was to prevent those providers from using or dealing in the goods leased by rival rental suppliers.

172.    Hill-Rom and UHS's commitment contracts with healthcare providers together foreclosed a substantial share of the biomedical equipment rentals market.

173.    Hill-Rom and UHS's commitment contracts with healthcare providers have substantially lessened competition.

174.     Hill-Rom and UHS's commitment contracts with healthcare providers had no offsetting procompetitive justifications that could not have been achieved with less-restrictive alternatives.

4. Other Effects of the Conditioned Rental Agreements

175.     The above conditioned agreements, whether viewed together or separately, produced, and continue to produce, adverse, anti-competitive effects on interstate commerce in the United States, including, but not necessarily limited to, commerce in or affecting Texas.

176.     The above conditioned agreements, whether viewed together or separately, resulted in injury to the business or property of Freedom.

C.     **MONOPOLIZATION**

177.     Plaintiff reiterates the factual allegations contained in paragraphs 1-176.

178.     UHS has monopoly power in the biomedical equipment rentals market.

179.     UHS's agreements with GPOs and healthcare providers constituted exclusionary conduct.

180.     This exclusionary conduct helped UHS maintain or obtain its monopoly power.

181.     This exclusionary conduct had no offsetting procompetitive justifications that could not have been achieved with less-restrictive alternatives.

182.     This exclusionary conduct produced, and continues to produce, adverse, anti-competitive effects on interstate commerce in the United States, including, but not necessarily limited to, commerce in or affecting Texas.

183.     This exclusionary conduct resulted in injury to the business or property of Freedom.

D.     **ATTEMPTED MONOPOLIZATION**

184.     Plaintiff reiterates the factual allegations contained in paragraphs 1-183.

185.     UHS's agreements with GPOs and healthcare providers constituted exclusionary conduct.

186.     UHS had the specific intent to monopolize the biomedical equipment rentals market with this exclusionary conduct, which had no procompetitive justification.

187.     UHS has market power and has or had a dangerous probability of acquiring monopoly power in the biomedical equipment rentals market because of its exclusionary conduct.

188.     This exclusionary conduct produced, and continues to produce, adverse, anti-competitive effects on interstate commerce in the United States, including, but not necessarily limited to, commerce in or affecting Texas.

189.     This exclusionary conduct resulted in injury to the business or property of Freedom.

**E.     CONSPIRACY TO MONOPOLIZE**

190.     Plaintiff reiterates the factual allegations contained in paragraphs 1-189.

191.     UHS's agreements with GPOs and healthcare providers constituted a conspiracy.

192.     UHS, Premier, Novation, and other GPOs specifically intended these agreements to help UHS monopolize the biomedical equipment rentals market.

193.     UHS's agreements with GPOs and healthcare providers were implemented with overt acts enforcing and complying with their exclusionary provisions.

194.     This conspiracy to monopolize produced, and continues to produce, adverse, anti-competitive effects on interstate commerce in the United States, including, but not necessarily limited to, commerce in or affecting Texas.

195.     This conspiracy to monopolize resulted in injury to the business or property of Freedom.

**F.      TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

196.      Plaintiff reiterates the factual allegations contained in paragraphs 1 -195.

197.      Defendants interfered with Freedom's business relations, including its existing and prospective business contracts.

198.      Defendants had actual knowledge of the existence of Freedom's contracts and its interest therein, or knowledge of facts and circumstances that would lead a reasonable person to know of their existence.  Defendants have willfully and intentionally committed acts that were calculated to, and did as a result of the interference, cause damage to plaintiff in its lawful business.  Defendants' acts were the proximate cause of actual damage and loss to plaintiff.

199.      Defendants have also acted intentionally and unlawfully without privilege or justification in a manner that has interfered with plaintiff's prospective business relations, and/or has prevented plaintiff from entering into business contracts where a reasonable probability existed that the contracts would have been entered into but for these defendants' interference.  Defendants' intentional, unlawful, and unexcused interference with plaintiff's ability to enter into business relations and business contracts with potential healthcare providers seeking to rent biomedical equipment rental was the proximate cause of actual injury and special financial damage to Freedom.

200.      Defendants are jointly and severally liable for their actions as described in the foregoing paragraphs.  In addition, because of the knowing, malicious or reckless nature of their conduct, defendants are liable for punitive damages.

**G.      BUSINESS DISPARAGEMENT**

201.      Plaintiff reiterates the factual allegations contained in paragraphs 1 –200.

202.      Defendants have utilized disparaging words against Freedom grounded in falsity and malice.  Defendants lacked privilege in making these statements, knew of these falsities, acted with reckless disregard for the truth, or acted with ill will or intent to interfere in the economic interests of Freedom.

203.     As a result of defendants' intentional, unlawful, and unexcused use of disparaging words grounded in falsity and malice, Freedom was injured and financially damaged.

204.     Defendants are jointly and severally liable for their actions as described in the foregoing paragraphs. In addition, because of the knowing and reckless nature of their conduct, defendants are liable for punitive damages.

### H.     COMMON LAW CONSPIRACY

205.     Plaintiff reiterates the factual allegations contained in paragraphs 1 -204.

206.     Defendants combined and conspired to interfere with Freedom's contracts and prospective business relations and to disparage Freedom by engaging in the conduct described above, including, but not limited to, making false statements about Freedom's business and biomedical equipment and entering into anticompetitive agreements.  Each defendant agreed and intended to participate in the conspiracy, and engaged in one or more overt acts in the United States or Texas, or both, in furtherance of the conspiracy.

207.     As a result of defendants' intentional, unlawful and unexcused conduct and conspiracy, defendants wrongfully denied Freedom's access to the relevant markets, thereby injuring plaintiff and damaging it financially.

208.     Defendants are jointly and severally liable for Freedom's damages. Further, because of the knowing and reckless nature of their conduct, defendants are liable for punitive damages.

### V.     NOTICE

209.     As required by Section 15.21(C) of the Texas Business and Commerce Code, a copy of the original complaint was mailed to the Attorney General of the State of Texas.

### VI.     INJUNCTIVE RELIEF

210.     Unless they are enjoined, defendants' unlawful agreements will continue to cause anticompetitive injury the market and to Freedom.

211.     Defendants have engaged in a continuing pattern and practice of illegal acts that are likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

212.     Undoing the anticompetitive effects of the defendants' agreements also requires permanently enjoining them from entering into such agreements.

213.     Denying defendants the fruits of their unlawful agreements and acts requires enjoining them to disgorge any profits they reaped by their illegal agreements and conduct.

214.     Freedom seeks an injunction enjoining each defendant from continuing the unlawful conduct alleged herein, from entering into any other combination, conspiracy or agreement having similar purposes and effects, and requiring each defendant to disgorge any profits they earned through such unlawful conduct.

## VII.   PRAYER

Accordingly, Freedom respectfully requests that defendants Hill-Rom, UHS, Novation, and Premier be cited to appear, and that plaintiff have judgment against defendants (jointly and severally where appropriate) for:

a.     actual damages, including lost profits, raised costs, and other injuries;

b.     punitive damages;

c.     additional and/or treble damages as provided by statute;

d.     injunctive relief, including disgorgement of any profits gained by illegal conduct;

e.     costs of suit, including reasonable attorneys' fees; pre-judgment and post-judgment interest at the maximum rate permitted by law; and

f.     such other relief to which plaintiff may be entitled.

Respectfully submitted,

Nicholas H. Patton
SBN: 63035
Patton Tidwell & Schroeder, LLP
4605 Texas Boulevard
Post Office Box 5398
Texarkana, Texas 75505-5398
(903) 792-7080
(903) 792-8233 (fax)

ATTORNEY FOR PLAINTIFF
FREEDOM MEDICAL, INC.